# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-153 (RCL)** |
| **v.** | : | |
| | : | |
| **RAUL JARRIN,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Raul Jarrin to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### I.    Introduction

Defendant, Raul Jarrin ("Jarrin"), a 63-year-old tax accountant employed by Ernest & Young, L.L.P., who resides in Houston, Texas, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on February 8, 2023, (ECF No. 32 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

Defendant Jarrin pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  As explained herein, a sentence of incarceration is appropriate in this case because Jarrin (1) ignored visual and audible signs that he was not authorized to enter the Capitol; (2) entered the restricted grounds of the Capitol, ignoring the physical barricades on the Capitol grounds; (3) entered the Capitol after the shooting of Ashli Babbit when police officers were attempting to remove rioters from the Capitol; (4) lied to the Federal Bureau of Investigation ("FBI") by denying that he was inside of the Capitol on January 6; (5) deleted photographs and video from his cell phone taken on January 6 after he left the Capitol; and (6) has failed to express remorse or contrition.

The Court must also consider that Raul Jarrin's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Jarrin's crime support a sentence of 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution this case.  Jarrin ignored multiple audible and visual signs that he should not have entered the Capitol and the Capitol grounds, and lied to the FBI about being inside of the Capitol. These facts, along with his lack of remorse, weigh against a sentence of probation.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 32 (Statement of Offense), at 1-7.

*Defendant Raul Jarrin's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Raul Jarrin traveled to Washington, D.C., from his home in Houston, Texas to attend the "Stop the Steal" rally.   Jarrin flew from Texas to Washington D.C. and stayed in a hotel in Bethesda, Maryland, on the night of his arrival.  On January 6, 2021, Jarrin attended the "Stop the Steal" rally.   After attending the rally, Jarrin walked to the Capitol with other protestors.

In his pre-arrest, voluntary interview, Jarrin provided details about the observations he made while walking towards the Capitol.  During his walk to the Capitol, Jarrin observed that the crowd of protestors were becoming "rowdy."  Upon arriving at the U.S. Capitol from the west front, Jarrin observed a crowd of protestors outside of the Capitol.   Protestors were climbing scaffolding and attempting to enter the Capitol. Jarrin proceeded to walk from the west front of the Capitol to the east front, ignoring the ongoing chaos, much of which was violent.

Upon arriving at the east front, Jarrin also observed physical altercations occurring, and observed police using tear gas to fend off rioters. Still, Jarrin was undeterred. He proceeded to the Capitol, entering through the East Front House Door at approximately 2:45 p.m.  *See* Image 1.



*Image 1*
*Screenshot from Capitol security video at 2:45 p.m.*

Upon entering the Capitol, CCTV footage captured Jarrin used his cell phone to take pictures of the inside of the Capitol. *See* Images 2 and 3.



*Image 2*
*Screenshot from Capitol security video at 2:45 p.m.*



*Image 3*
*Screenshot from Capitol security video at 2:45 p.m.*

Jarrin heard protestors mention that someone inside of the Capitol had been shot. Indeed Jarrin was positioned near the Speaker's Lobby where rioter Ashli Babbit was shot. When Jarrin

made his entry at this location, officers were responding to the shooting and attempting to remove rioters from the location of the shooting.  A crowd of rioters stood in the area where Jarrin was positioned, blocking him from making further entry into the Capitol.  Jarrin continued to take pictures as he stood inside of the entryway, at one point capturing a photograph of the rioters who blocked him from further entering the Capitol. *See* Image 4.



Image 4
*Photograph taken by Jarrin and located in his telephone*

Jarrin was inside of the Capitol for approximately 15 seconds before exiting the building.

On January 8, 2021,  Jarrin sent pictures and a video that he took on January 6 with his cell phone to his brother. The two-second video shows the police officers located near Jarrin's point of entry.  *See* Image 5.



Image 5
*Still photograph of the video taken from Jarrin's cell phone*

The following conversation between Jarrin and his brother, regarding the video and photographs, was found in Jarrin's telephone records:

> Jarrin's Brother:  "Dude…you went all the way into the Capital building??? That looks like the top of the stairs????"

> Jarrin:  "Allegedly!"

> Jarrin's Brother:  "WOW….That is NUTS!!!! Don't show anyone else that video or any other videos you may have showing you in or near the Capital.  They are looking to prosecute those who entered the Capital.  And DON'T tell anyone you were their at the Capital.  Just tell them you were at the protest.  They have already arrested several people who were identified as being in the Capital."

When asked if he went inside of the Capitol, Jarrin coyly answered, "Allegedly."  Jarrin's brother instructed him not to show videos of him being physically near or inside of the Capitol because rioters were being prosecuted.  Jarrin's brother instructed him to tell others that he only attended the rally on January 6.  Jarrin proceeded to do just as his brother instructed when he was interview by the FBI.

*Jarrin's Interview with FBI*

Prior to meeting with Jarrin, the FBI obtained CCTV video and still images of multiple rioters who had entered the Capitol on January 6.  According to records obtained through a search warrant served on Google, agents learned that a mobile device associated with Jarrin's email account was present inside of the Capitol on January 6.  After obtaining additional subscriber information, the FBI was able to confirm that Jarrin was the subscriber of a telephone number, associated with the Google email account.  Armed with this information, and the video and photographs from the Capitol depicted in Images 1 and 2, above, the FBI located Jarrin to interview him regarding his whereabouts on January 6.

Jarrin agreed to a voluntary interview.  The interview occurred on July 2, 2021, months after the attack on the Capitol.  During the interview, Jarrin admitted traveling to Washington and attending the rally on January 6, but repeatedly lied and claimed he had not gone inside the Capitol. Jarrin was repeating the "story" that his brother suggested in the days following January 6.

Specifically, Jarrin told the FBI that he left the area near the Capitol at approximately 2:10 p.m.  In support of his claim, Jarrin showed agents one picture that he took with a time stamp of 2:10 p.m.  The picture captured Jarrin outside of the Capitol.  Jarrin's phone did not have any additional pictures after 2:10 p.m.  However, upon performing a detailed examination of Jarrin's cellphone records, agents were able to locate additional photographs and videos, that had been deleted from Jarrin's physical phone.

After his July 2, 2021 interview, Jarrin sent two emails on July 5, 2021, to the FBI in an effort to convince agents that he was not at the Capitol on January 6.  In one email, Jarrin sent his travel information showing that he scanned his SmarTrip card at 3:57 p.m. at the Eastern Market Metro Station in D.C., and scanned the card again at 4:36 p.m. when he exited at the Bethesda

Metro Station.  This time frame, however, did nothing to negate that Jarrin was indeed inside of the Capitol on January 6.

In his second email, Jarrin sent agents pictures of the clothing that he wore on January 6. *See* Image 10.



Image 10

Notably, Jarrin included a knit cap in the picture, instead of the "Make America Great Again" hat that he actually wore on January 6.  This conduct further represents the efforts that Jarrin took to mislead the FBI about his conduct on January 6.  By providing false information about what he wore, Jarrin was thwarting efforts that FBI was making to confirm his identity.

*Charges and Plea Agreement*

On March 1, 2022, the United States charged Jarrin by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), Entering and Remaining in a Restricted Building with Intent to Impede or Disrupt Official Functions, and 40 U.S.C. §§ 5104(e)(2)(D) and (G), Disorderly and Disruptive Conduct on the Capitol Grounds, and Parading, Demonstrating, or Picketing in a Capitol Building. On March 8, 2022, Jarrin voluntarily surrendered at the FBI field office in Houston, Texas.  On May 3, 2022, the United States charged Jarrin by a four-count Information with violating the same four statutes. On February 8, 2023, pursuant to a plea agreement, Jarrin pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. §

5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Jarrin agreed to pay $500 in restitution to the Architect of the Capitol.

### III.   Statutory Penalties

Jarrin now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As noted by the plea agreement and the U.S. Probation Office, Jarrin faces up to six months of imprisonment and a fine of up to $5,000. Jarrin must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Jarrin's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Jarrin, the absence

of violent or destructive acts is not a mitigating factor. Had Jarrin engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Jarrin's case is entry onto the Capitol grounds and the Capitol despite of what he witnessed prior to entering the Capitol.  According to Jarrin's statement to FBI, he saw and heard the crowd of protestors in an agitated state.  Upon approaching the Capitol, he observed rioters fighting, scaling/climbing scaffolding, while attempting to enter the Capitol, and rioters being sprayed with tear gas by police.  Despite seeing these audible and visual signals, Jarrin still entered the Capitol.   While Jarrin only remained inside the Capitol for approximately 15 seconds, he entered the Capitol at a time that was critical given the mass of rioters who had made entry into the Capitol, overwhelming police who were attempting to calm the rioters and remove the mass of rioters from the Capitol. Notably, police officers were responding to the shooting of Ashli Babbit which occurred near the Speaker's Lobby, near Jarrin's point of entry.  By his own admission to FBI, Jarrin said that he heard that a rioter had been shot while he was inside of the Capitol. When the shooting occurred, officers were attempting to prevent rioters from entering the area where the shooting occurred.  This would have included rioters who would have approached from Jarrin's point of entry.  Therefore, it is likely that Jarrin was unable to move further into the Capitol and had to leave the area.  Indeed, officers deployed teargas to prevent the rioters from gathering in the area.  Once the gas deployed, rioters left out of the East Front Doors.

The second most important factor is Jarrin's lack of candor when he met with the FBI. Jarrin repeatedly denied being inside of the Capitol on January 6.  Following the advice that he received from his brother in the days after January 6, Jarrin maintained that he only went to the rally on January 6.  Jarrin's account was untruthful as evidenced by telephone records that placed

him inside of the Capitol.  Even months after January 6, maintained that he was not inside of the Capitol.

The third most important factor is Jarrin's lack of remorse and contrition. Unlike many January 6 defendants, Jarrin did not accept responsibility for his actions soon after being charged, but waited almost a year. While Jarrin has accepted responsibility, he has never expressed remorse for his actions. To the contrary, despite his awareness that he had committed a crime, his lies and efforts to deceive the FBI demonstrate an utter lack of remorse.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Jarrin

As set forth in the PSR, Jarrin is employed as a tax senior accountant with Ernest & Young, L.L.P. in Houston, Texas. ECF 35 ¶ 71.  Jarrin has no criminal history. He has been compliant with his conditions of pre-trial release.

Unlike some defendants, Jarrin has no history of abuse or difficult circumstances to explain his decision to break the law. Nor can Jarrin, age 63, blame youth or inexperience for his actions.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to

convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As noted above, in addition to expressing no remorse for his conduct on January 6, Jarrin not only lied to the FBI, but he affirmatively attempted to deceive them. Jarrin displayed the same contempt for law enforcement and the rule of law that he demonstrated on January 6, and so there is a clear need for this Court's sentence to deter Jarrin from ever again breaking the law.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Jarrin based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Jarrin has pleaded guilty to Count Four of the Information, charging him Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants with who acted with similar conduct to Jarrin have received sentences of incarceration.

In *United States v. John Lammons*, 22-cr-103 (RCL), the defendant, like Jarrin, approached the Capitol through the chaos of the west front, Lammons, unlike Jarrin, breached the Capitol at the Senate Wing door within minutes of the initial breach, boasted (of his actions in illegally storming the Capitol, and engaged in certain aggravating behavior that distinguishes him from Jarrin, in that he urged rioters "to hold their ground" and he appeared to smoke an illegal substance inside the Capitol. Jarrin, however, also engaged in aggravating behavior different from that of Lammons, in that he intentionally misled the FBI during his interview, and tried to conceal his involvement at the Capitol. Lammons, on the other hand, interviewed with the FBI and showed the agents videos he had recorded of his illegal actions on January 6. In comparison, Jarrin deleted his videos and photographs. The government sought, and the court imposed, 30 days' incarceration and 36 months' probation for Lammons.

In *United States v. Adam Miller*, 22-cr-191 (RCL), the defendant, like Jarrin, observed conduct by rioters that should have thwarted him from entering the Capitol. Miller observed that rioters had smashed the windows of the Capitol when he entered the building. Jarrin, similarly, had approached the Capitol from the west front and observed fights occurring, and rioters climbing scaffolding. Upon making his way to the top of the stairs, police officers flanked the doors of the Capitol. And still, Jarrin chose to enter the Capitol. Like Miller, Jarrin heard that a fellow rioter had been shot. Miller refused to leave in spite of learning of this information. Jarrin, on the other hand, could not proceed forward inside of the Capitol because a crowd of rioters were being pushed away from the location of the shooting. A significant distinguishing factor present in Jarrin's case,

that was not present in Miller's case, is the fact that Jarrin attempted to deceive the FBI, and deleted evidence showing his conduct. The government sought a sentence of 21 days' incarceration and 36 months' probation for Miller.  The Court sentenced Miller to 30 days' incarceration.

In *United States v. Devin Steiner*, 22-cr-191 (RCL), the defendant, Miller's co-defendant exhibited similar to conduct to Miller, with the exception that similar to Jarrin, he deleted evidence of his participation in the riot, and encouraged others to do so.   Additionally, neither Steiner, Miller, nor Jarrin expressed remorse for their conduct after January 6. The Court sentenced Steiner to 30 days' incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

18

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Jarrin must pay $500 in restitution, which reflects in part the role he played in the riot on January 6.[4] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Jarrin's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 88.

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

**VI.     Fine**

Pursuant to U.S.S.G. §5E1.2(a), the Court shall impose a fine in all cases, except when the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. Here, U.S. Probation has determined that based upon his financial condition, Jarrin can pay a fine. *See* PSR ¶ 75.  While the government is not requesting that a fine be imposed, it recognizes that it is within the Court's discretion to impose a fine in this matter given the determination made by U.S. Probation Office.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:_____/s/ Brittany L. Reed_
BRITTANY L. REED
Trial Attorney – Detailee
La. Bar No. 31299
650 Poydras Street, Ste. 1600
New Orleans, Louisiana 70130
Brittany.Reed2@usdoj.gov
Telephone: (504) 680-3031

## CERTIFICATE OF SERVICE

On this16th day of June 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ Brittany L. Reed_
Assistant United States Attorney